UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CARRIE WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:12CV1889 LMB |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision finding Carrie Williams' disability to have ended

November 1, 2010.  All matters are pending before the undersigned United States

Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

Because the final decision is supported by substantial evidence on the record as a

whole, the decision of the Commissioner is affirmed.

### I.  Procedural History

On September 8, 2004, the Social Security Administration (SSA) awarded

plaintiff Carrie Williams benefits on her application for disability insurance

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
As such, she is substituted for Michael J. Astrue as the defendant in this cause of action.  Fed. R.
Civ. P. 25(d).

benefits, finding plaintiff to be disabled as of July 1, 2003, because of the effects of

bipolar disorder.  (*See* Tr. 11, 45-48.)  Upon periodic review for continued

entitlement to benefits, the SSA determined on November 5, 2010, that plaintiff

achieved medical improvement such that she was able to perform work.  The SSA

determined plaintiff's disability to have ceased November 1, 2010, and, as such,

plaintiff's receipt of benefits ceased in January 2011.  (Tr. 41, 44, 45-48.)  Upon

plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ)

on June 16, 2011, at which plaintiff and a vocational expert testified.  (Tr. 23-40.)

On August 26, 2011, the ALJ issued a decision finding plaintiff's disability to have

ended November 1, 2010.  The ALJ specifically found that beginning on

November 1, 2010, plaintiff could perform her past relevant work as a house

cleaner.  (Tr. 8-22.)  On September 17, 2012, upon review of additional evidence,

the Appeals Council denied plaintiff's request for review of the ALJ's decision.

(Tr. 1-5.)  The ALJ's determination thus stands as the final decision of the

Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff contends that the ALJ's

decision is not supported by substantial evidence on the record as a whole

inasmuch as the ALJ failed to properly consider the medical opinion evidence of

record and thus erred in his determination of plaintiff's RFC.  Plaintiff further

contends that evidence of plaintiff's activities, upon which the ALJ relied in

making his RFC determination, provides an insufficient basis upon which to find plaintiff able to perform her past work.  Finally, plaintiff argues that the vocational expert's testimony conflicts with the *Dictionary of Occupational Titles* (*DOT*) and thus that the ALJ erred by relying on such testimony to find plaintiff able to perform work-related activities.  Plaintiff requests that the Commissioner's final decision be reversed and that the matter be remanded for further consideration.

## II.  Testimonial Evidence Before the ALJ

A.   Plaintiff's Testimony

At the hearing on August 26, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was thirty-three years of age.  Plaintiff previously attended college for two years but did not obtain a degree.  Plaintiff stands approximately five feet, six inches tall and weighs 244 pounds.  Plaintiff has two children, ages five and seven.  (Tr. 26, 30.)

Plaintiff testified that she worked at Wal-Mart in 1998 and 1999 as a cashier. From 1999 to 2000, plaintiff worked at Grove Furniture sewing fabric for furniture.  In 2000, plaintiff sold insurance for Western and Southern Life.  In 2001, plaintiff worked as a house cleaner at Cleaning by House Beautiful.  From 2002 to 2003, plaintiff worked as a customer care representative at a telecommunications company.  Plaintiff testified that she stopped working in 2003

when she had a baby, after which she was hospitalized for bipolar disorder.
Plaintiff testified that she could not cope with stress.  (Tr. 26-28, 30-31, 34-35.)

Plaintiff testified that she currently saw a psychologist once a week upon the
recommendation of her treating doctor, Dr. Arain.  Plaintiff testified that Dr. Arain
became concerned regarding plaintiff's increased symptoms of depression,
including social withdrawal, excessive sleep, and decreased interest in activities.
Plaintiff testified that she also experienced episodes of mania and that her
psychologist recommended that she give her credit cards, check book, and excess
medication to her husband so that she would not excessively spend or take too
much medication.  Plaintiff testified that her manic episodes last several weeks,
after which she experiences another bout of depression.  Plaintiff testified that she
also experienced episodes of "cutting," whereby she would attempt to cut herself
using box cutters or her fingernails.  (Tr. 31-33.)

Plaintiff testified that her condition has not changed since being placed on
disability.  Plaintiff testified that she takes medication for her condition, which
helps the "dips not be as severe," but that the medication is not always effective.
Plaintiff testified that she experiences side effects with her medication, including
extreme drowsiness, dizziness, dry mouth, weight gain, and loss of desire.  (Tr. 33-
34.)

Plaintiff testified that she self-published a book in 2008.  Plaintiff testified

- 4 -

that it took her six months to actually write the book, after which it took one year to proofread.  Plaintiff testified that she then hired an editor for book editing.  (Tr. 29-30.)  Plaintiff testified that she wrote down her ideas for the book during her manic episodes when thoughts raced through her head.  (Tr. 33.)

B.    Testimony of Vocational Expert

Ms. Gonzales, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

The ALJ asked Ms. Gonzales to assume an individual twenty-five years of age with no physical restrictions.  The ALJ asked Ms. Gonzales to further assume the individual to be able to understand, remember, and carry out simple instructions and non-detailed tasks.  Ms. Gonzales testified that such an individual would be able to perform plaintiff's past work as a house cleaner, classified as medium and unskilled work.  (Tr. 36.)

The ALJ then asked Ms. Gonzales to assume an individual with limitations as described in Dr. Arain's Medical Source Statement, dated February 21, 2011.  Ms. Gonzales testified that such a person could perform plaintiff's past work as a house cleaner.  (Tr. 37.)

The ALJ then asked Ms. Gonzales to assume an individual with limitations as described in Dr. Bosse's Mental RFC Questionnaire, dated May 20, 2011.  Ms. Gonzales testified that such a person could not perform any of plaintiff's past

relevant work or any other work in the national economy.  (Tr. 37-38.)

### III.  Medical Records Before the ALJ

From February through December 2004, plaintiff was treated at South County Family Mental Health Center for bipolar II disorder with post-partum onset.  Plaintiff repeatedly complained of mood swings, paranoia, and depression. Plaintiff was treated with individual psychotherapy sessions and multiple medications, including Lexapro, Trileptal, Risperdal, Zoloft, Topamax, Effexor, and Wellbutrin.[2]  Plaintiff's Global Assessment of Functioning (GAF) scores during this period ranged from 45 to 57.[3]  (Tr. 288-334.)

Plaintiff visited Dr. Thomas Nowotny at Associates in Behavioral Health on October 6, 2005, who noted plaintiff's past mental health history to include an exacerbation of unstable mood in 2003 while post-partum.  Plaintiff obtained

---

[2]  Lexapro, Effexor, and Wellbutrin (Bupropion) are used to treat depression.  Medline Plus, <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html>; <http://www.nlm.nih. gov/medlineplus/druginfo/meds/a603005.html>; <http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a695033.html>.  Trileptal, a seizure medication, and Risperdal are used to treat bipolar disorder.  Medline Plus <http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a601245.html>; <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html>.  Zoloft is used to treat depression, panic disorder, and obsessive compulsive disorder (OCD).  Medline Plus <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html>.  Topamax, a seizure medication, is used to treat migraine headaches.  Medline Plus <http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a697048.html>.

[3]  A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).  A GAF score of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).  A GAF score of 51 to 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional

benefit at the time with Zoloft.  Plaintiff then lost her Medicaid coverage, after which she took no medication and became manic.  Plaintiff reported that she was then hospitalized and treated with Risperdal, Trileptal, and Zoloft, from which she obtained benefit.  Plaintiff reported that she did well and subsequently became pregnant, at which time she stopped taking medication.  It was noted that plaintiff recently delivered a baby two months prior.  Plaintiff reported that she had been doing well until recently.  Dr. Nowotny noted that plaintiff was currently taking Zoloft.  Mental status evaluation showed plaintiff to be cooperative and calm. Plaintiff was noted to have a flat affect and anxious mood.  Plaintiff's speech was normal, and her thought process was intact.  Plaintiff denied having any hallucinations, delusions, or suicidal or homicidal ideations.  Dr. Nowotny instructed plaintiff to increase her dosage of Zoloft and to return in two to three months for follow up.  (Tr. 187-90.)

Plaintiff returned to Dr. Nowotny at Behavioral Health on January 30, 2006, and reported that she stopped taking Zoloft in November 2005 because of loss of insurance.  Plaintiff reported that she previously obtained the best relief from Trileptal and Bupropion.  Plaintiff currently complained of fatigue.  Mental status examination showed plaintiff's mood to be "up and down."  Plaintiff's judgment

---

panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

was noted to be good, and her flow of thought was logical and sequential.  Plaintiff was diagnosed with bipolar affective disorder.  Plaintiff was prescribed Trileptal and Wellbutrin and was instructed to return in two months.  (Tr. 185.)

In March 2006, Dr. Nowotny prescribed Fluoxetine[4] in response to plaintiff's complaints of increased irritability and migraine headaches.  (Tr. 184.)  In August 2006, plaintiff reported that she was doing well and was active with increased socialization.  (Tr. 183.)  In December 2006, plaintiff reported having symptoms of depression with feelings of isolation.  Dr. Nowotny instructed plaintiff to take Wellbutrin regularly and to increase her dosage of Trileptal.  (Tr. 182.)

In March and September 2007, Dr. Nowotny noted plaintiff to be doing well and to have a stable mood.  Plaintiff was continued on her current medications.  (Tr. 180, 181.)

On November 3, 2008, plaintiff reported to Dr. Nowotny that she was selling a book.  Plaintiff reported having increased anxiety with panic attacks.  Mental status examination was unremarkable.  Dr. Nowotny instructed plaintiff to increase her dosage of Fluoxetine and to return for follow up in four to six months.  (Tr. 179.)

---

[4]  Fluoxetine (Prozac) is used to treat depression, OCD, and panic attacks.  Medline Plus <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html>.

On May 12, 2009, Dr. Nowotny determined to adjust plaintiff's medication in response to her reports of agitation and "blah" mood.  On September 8, 2009, it was noted that plaintiff was doing well.  (Tr. 177, 178.)

Plaintiff returned to Dr. Nowotny at Behavioral Health on February 2, 2010, and reported that she was struggling with finances and that she had no health insurance.  Plaintiff complained of loss of interest.  Mental status examination showed plaintiff to have an anxious mood and flat affect.  Plaintiff was continued in her diagnosis of bipolar affective disorder and was assigned a GAF score of 50.  Plaintiff was instructed to continue with her current medications and was provided additional prescriptions for Abilify[5] and Lamictal.[6]  (Tr. 175-76.)

On March 31, 2010, plaintiff did not appear for a scheduled appointment at Behavioral Health.  (Tr. 174.)  Plaintiff returned to Behavioral Health on June 21, 2010, and reported to Dr. Nowotny that she was doing well.  Plaintiff was instructed to continue with her current medications.  (Tr. 173.)

On October 19, 2010, plaintiff underwent a consultative psychiatric examination for disability determinations.  Dr. Georgia Jones noted plaintiff's past mental health history.  Plaintiff reported to Dr. Jones that she did not feel the need to return to work and that she often quit her job in the past when things became

---

[5]  Abilify is used to treat schizophrenia, bipolar disorder, and depression.  Medline Plus <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html>.

stressful.  Plaintiff reported having written and sold five self-published books and

that she sold eighteen copies of a book at a book signing event.  Plaintiff reported

that she currently took Abilify and Trazodone,[7] which helped her condition.

Plaintiff also reported that she took Lamotrigine, Fluoxetine, and Bupropion.

Plaintiff reported that taking her children for walks helped with her mood, sleep,

focus, and concentration.  Plaintiff reported having increased irritability and

anhedonia.  Plaintiff reported having mood swings.  Mental status examination

showed plaintiff to be pleasant, cooperative, and to have good eye contact.

Plaintiff was noted to have spontaneous speech, which was coherent, relevant, and

logical.  Dr. Jones noted plaintiff's mood to be euthymic and her affect to be

stable, bright, euthymic, and reactive.  Sensorium examination was unremarkable.

As to her daily activities, plaintiff reported that she forces herself to do the chores.

Plaintiff reported that she drives a lot, goes to church, pays the bills, goes out to

eat, and participates in "fun activities."  Dr. Jones opined that plaintiff's social

functioning and ability to care for her personal needs were intact.  Dr. Jones noted

plaintiff's concentration, persistence, and pace to be good throughout the

examination.  Dr. Jones diagnosed plaintiff with bipolar disorder, by history, and

---

[6]  Lamictal (Lamotrigine), a seizure medication, is used to treat bipolar disorder.  Medline Plus
<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html>.

[7]  Trazodone (Oleptro) is used to treat depression.  Medline Plus <http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a681038.html>.

assigned a GAF score of 65.[8]  Dr. Jones determined plaintiff's prognosis to be

good.  (Tr. 191-95.)

On November 5, 2010, Dr. Joan Singer, a psychological consultant with

disability determinations, completed a Psychiatric Review Technique Form

(PRTF) in which she opined that plaintiff's bipolar disorder caused plaintiff to

have mild limitations in her activities of daily living and in maintaining social

functioning; moderate limitations in maintaining concentration, persistence, or

pace; and no repeated episodes of decompensation of extended duration.  (Tr. 196-

206.)  In a Mental RFC Assessment completed that same date, Dr. Singer opined

that, in the domain of Understanding and Memory, plaintiff was moderately

limited in her ability to understand and remember detailed instructions, but was not

otherwise significantly limited.  In the domain of Sustained Concentration and

Persistence, Dr. Singer opined that plaintiff was not significantly limited in her

ability to carry out very short and simple instructions, to sustain an ordinary

routine without special supervision, to work in coordination with or in proximity to

others without being distracted by them, and to make simple work-related

decisions.  Dr. Singer further opined that plaintiff was moderately limited in her

ability to carry out detailed instructions; to maintain attention and concentration for

_____

[8]  A GAF score of 61 to 70 indicates some mild symptoms (*e.g.*, depressed mood and mild
insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional

extended periods; to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances; and to complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  In the domain of Social Interaction, Dr. Singer opined that plaintiff experienced no significant limitations.  In the domain of Adaptation, Dr. Singer opined that plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, but was not otherwise significantly limited.  Upon review of the evidence of record, Dr. Singer noted that plaintiff's psychiatric treatment helped maintain stable functioning and that plaintiff's outpatient psychiatric visits were more intermittent in nature.  Dr. Singer noted the post-partum issues relating to the initial determination of disability to no longer be a concern and that plaintiff had not required any hospitalizations since that time. In addition, Dr. Singer noted plaintiff to be the primary caregiver for her two children.  Dr. Singer concluded that plaintiff experienced significant work-related improvement and that she was currently able to perform at least simple, repetitive tasks on a routine basis.  (Tr. 207-10.)

On November 23, 2010, plaintiff failed to appear for a scheduled

---

truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

appointment at Behavioral Health.   (Tr. 213.)

Plaintiff visited Dr. Nowotny at Behavioral Health on December 2, 2010, and reported that she had not been doing well since undergoing disability review. Plaintiff reported situational stress in her life.  Plaintiff's mood was noted to be nervous.  Plaintiff denied any hallucinations or suicidal or homicidal ideations, but admitted to having thoughts of cutting herself.  Dr. Nowotny assigned a GAF score of 50 and determined to target plaintiff's anxiety with an increase in Trazodone. Plaintiff was instructed to return in two to three months.  (Tr. 211-12.)

On December 2, 2010, plaintiff visited St. Anthony's Medical Center – Hyland Behavioral Health and complained of experiencing increased stress and anxiety for one month associated with her disability review, her husband's health, and her husband's work issues.  Plaintiff requested to see a counselor.  Plaintiff's current medications were noted to include Bupropion, Fluoxetine, Abilify, Lamotrigine, Trazadone, and Oleptro.  Mental status examination showed plaintiff's attention and eye contact to be fair.  Plaintiff's mood and affect were depressed with noted episodic crying.  Plaintiff was noted to be withdrawn. Plaintiff reported having racing thoughts.  Plaintiff's speech, flow of thought, memory, and intellect were noted to be normal.  Plaintiff's judgment was noted to be fair.  Plaintiff was diagnosed with bipolar disorder and was assigned a GAF score of 59.  Plaintiff was referred for private counseling.  (Tr. 238-46.)

On December 8, 2010, Dr. James Spence, a psychological consultant with disability determinations, completed a Mental RFC Assessment wherein he opined that, in the domain of Understanding and Memory, plaintiff was moderately limited in her ability to understand and remember detailed instructions, but was not otherwise significantly limited.  In the domain of Sustained Concentration and Persistence, Dr. Spence opined that plaintiff was moderately limited in her ability to carry out detailed instructions, but was not otherwise significantly limited.  In the domains of Social Interaction and Adaptation, Dr. Spence opined that plaintiff experienced no significant limitations.  Upon review of the medical records, Dr. Spence opined that plaintiff was currently able to perform simple to moderately complex tasks.  (Tr. 216-18.)  In a PRTF completed that same date, Dr. Spence opined that plaintiff's bipolar disorder caused plaintiff to have mild limitations in the domains of Activities of Daily Living and Maintaining Social Functioning; and to have moderate limitations in the domain of Maintaining Concentration, Persistence, or Pace.  Dr. Spence further opined that plaintiff had no repeated episodes of decompensation of extended duration.  (Tr. 219-29.)

Plaintiff visited Dr. M. Sameer Arain, a psychiatrist, on January 10, 2011, and reported that she needed a new doctor.  Plaintiff reported that her previous psychiatrist refused to complete her disability papers in November 2010.  Plaintiff reported a history of depression and cutting, with excessive sleep, racing thoughts,

and engaging in risky behaviors.  Plaintiff reported that everything made her nervous, including dealing with people.  Plaintiff reported that she was currently stressed with raising her children, her husband's health issues for which he was seeking disability, financial issues, and dealing with the possibility of going back to work.  Mental status examination was essentially unremarkable but showed plaintiff's mood to be down and nervous, with a restricted affect.  Dr. Arain noted plaintiff's insight and judgment to be fair.  Dr. Arain diagnosed plaintiff with generalized anxiety disorder and bipolar disorder type II – depressed.  Dr. Arain assigned a current GAF score of 50.  Dr. Arain instructed plaintiff to continue on her current medications of Prozac, Abilify, Wellbutrin, Lamictal, and Trazodone. (Tr. 247-50.)

Plaintiff visited Dr. Jerry J. Bosse, a psychologist, on February 8, 2011, and reported that she was "not so good."  It was noted that information would be sought from Dr. Bosse and plaintiff's other psychiatrists for her hearing.  (Tr. 281.) On February 15, 2011, plaintiff reported to Dr. Bosse that she was doing "okay." (Tr. 280.)

In a Mental Medical Source Statement (MSS) completed February 21, 2011, Dr. Arain opined that plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; complete a normal

workday or workweek; perform at a consistent pace; get along with co-workers and peers; and respond appropriately to changes in the work setting.  In all other respects, Dr. Arain opined that plaintiff was not significantly limited.  Dr. Arain reported that he expected plaintiff's condition to improve.  (Tr. 252-53.)

On February 22, 2011, plaintiff reported to Dr. Bosse that her psychiatrist prescribed medication for her anxiety.  Plaintiff reported that her disability caseworker was not supportive, indicating that their psychiatrist reported that she should be able to go back to work.  (Tr. 277-78.)

On March 1, 2011, plaintiff reported to Dr. Bosse that her husband was approved for disability and seemed less stressed.  Plaintiff reported that her own caseworker was less supportive.  Dr. Bosse noted plaintiff to have a book signing scheduled for the last Saturday of the month in Poplar Bluff.  (Tr. 275-76.)  On March 9, 2011, plaintiff reported to Dr. Bosse that she was no longer writing and that her husband's first disability check would arrive in June.  Plaintiff reported that she was okay but felt flat.  Plaintiff reported her moods to be up and down. (Tr. 273-74.)  On March 15, 2011, plaintiff reported to Dr. Bosse that a mistake was made in that she had not received her disability check.  Plaintiff reported that she could not write when she felt down.  (Tr. 272.)  On March 22, 2011, plaintiff reported to Dr. Bosse that she was getting better sleep after using a CD at night. She reported that her psychiatrist recently changed her medication.  Plaintiff noted

that she continued to not receive disability checks and that she had not heard from her lawyer.  (Tr. 270-71.)

On March 29, 2011, plaintiff reported to Dr. Bosse that she was okay. Plaintiff reported that the book signing event went well and that she almost sold out of her books.  Plaintiff reported seeing a former classmate at the book signing and stated to Dr. Bosse that she might attend the next class reunion.  (Tr. 269.)

On April 5, 2011, Dr. Bosse noted that plaintiff looked stressed.  Plaintiff reported that she was off all of her medications and that she had not slept well. Plaintiff reported that she was worried about being depressed and manic.  Dr. Bosse advised plaintiff as to when to go to the emergency room.  Plaintiff reported feeling less depressed after this session.  (Tr. 267-68.)

Plaintiff returned to Dr. Bosse on April 19, 2011, and reported that she was recently released from the hospital.  Plaintiff reported being treated with medication in the hospital but that she was released without medication.  Plaintiff reported having just received her medication and that she felt better and was sleeping well.  (Tr. 266.)  On April 26, 2011, plaintiff reported to Dr. Bosse that her dosage of Effexor had been increased, making her drowsy.  (Tr. 265.)

In a Mental RFC Questionnaire completed May 20, 2011, Dr. Bosse reported that he had seventeen psychotherapy sessions with plaintiff between

December 21, 2010, and May 24, 2011,[9] and that plaintiff had made some improvement.  Dr. Bosse noted plaintiff's current GAF score to be 60, with her highest score within the previous year to be 65.  With respect to mental abilities needed to do unskilled work, Dr. Bosse opined that plaintiff was unable to meet competitive standards with regard to her ability to perform at a consistent pace without an unreasonable number and length of rest periods, and her ability to deal with normal work stress.  Dr. Bosse opined that plaintiff was seriously limited, but not precluded, with regard to her ability to maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically-based symptoms; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; and be aware of normal hazards and take appropriate precautions.  With respect to mental abilities needed to do semi-skilled and skilled work, Dr. Bosse opined that plaintiff was unable to meet competitive standards with regard to her ability to deal with the stress of semi-skilled and skilled work.  Dr. Bosse further opined that plaintiff was

---

[9]  Although Dr. Bosse reports here that he saw plaintiff through May 24, 2011, the undersigned notes that he completed this Questionnaire on May 20, 2011.

seriously limited, but not precluded, with regard to her ability to understand, remember, and carry out detailed instructions; and set realistic goals or make plans independently of others.  With respect to mental abilities needed to do particular types of jobs, Dr. Bosse opined that plaintiff was unable to meet competitive standards in her ability to travel to unfamiliar places; and was seriously limited, but not precluded, in her ability to use public transportation.  Although instructed to do so, Dr. Bosse provided no explanation for the limitations described, nor provided any medical/clinical findings to support the limitations.  Finally, Dr. Bosse opined that plaintiff's mental impairment or treatment therefor would cause her to be absent from work more than four days per month.  (Tr. 282-87.)

## IV.  Medical Records Before the Appeals Council[10]

Medical evidence submitted to and considered by the Appeals Council subsequent to the ALJ's decision shows that plaintiff visited the St. Alexius Psychiatric Clinic on December 5, 2011, and reported that she felt "back and forth."  It was noted that plaintiff engaged in no manic behavior.  Mental status examination was normal, and plaintiff's insight and judgment were noted to be

---

[10]  In determining plaintiff's request to review the ALJ's decision, the Appeals Council considered additional evidence that was not before the ALJ at the time of his decision.  The Court must consider this evidence in determining whether the ALJ's decision was supported by substantial evidence.  *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

fair.  Plaintiff's current medications were noted to include Wellbutrin, Klonopin,[11] Trazodone, Lamictal, and Effexor.  Plaintiff was provided refills on such medications and was instructed to return for follow up in six weeks.  (Tr. 341.)

On January 16, 2012, plaintiff reported to St. Alexius that she experienced intermittent high energy and low energy during the previous few days.  Plaintiff reported that she was sleeping well.  It was noted that plaintiff showed no evidence of psychosis.  Mental status examination was normal.  Plaintiff's mood was noted to be mellow and her affect reactive.  Plaintiff was instructed to continue on her current medications.  (Tr. 342.)

On February 13, 2012, plaintiff reported to St. Alexius that she felt agitated. It was noted that plaintiff exhibited no manic symptoms, and no evidence of psychosis was present.  Mental status examination showed no change.  Plaintiff was instructed to continue on her current medications.  Individual counseling was recommended.  (Tr. 343.)

## V.  The ALJ's Decision

The ALJ found September 8, 2004, to be the date upon which the most recent favorable medical decision was entered finding plaintiff to be disabled.  The ALJ found that, at that time, plaintiff's medically determinable impairment of

---

[11]  Klonopin, a seizure medication, is used to relieve panic attacks.  Medline Plus <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html>.

bipolar disorder precluded plaintiff from tolerating the normal stresses and

pressures of working, from completing a normal workday and workweek without

frequent interruptions from psychologically-based symptoms, from performing at a

consistent pace without an unreasonable number and length of breaks, and from

maintaining her attention and concentration on work tasks on a sustained basis.

The ALJ also found that, at that time, plaintiff would experience absences and rest

periods because of psychiatric symptoms.  The ALJ further found that through

November 1, 2010, plaintiff did not engage in substantial gainful activity.  The

ALJ found that plaintiff did not develop any additional impairments after

September 8, 2004, and before November 1, 2010.  The ALJ determined that

plaintiff continued to have bipolar disorder as of November 1, 2010, which was

severe, but that plaintiff did not have an impairment or combination of

impairments that met or medically equaled an impairment listed in 20 CFR Part

404, Subpart P, Appendix 1.  The ALJ found that, as of November 1, 2010,

plaintiff had no physical restrictions and had the RFC to understand, remember,

and carry out at least simple instructions and non-detailed tasks.  The ALJ

determined that medical improvement occurred as of November 1, 2010, and that

such improvement related to the ability to work since it resulted in an increase in

plaintiff's RFC.  The ALJ determined that, beginning November 1, 2010, plaintiff

could perform her past relevant work as a house cleaner, and thus that plaintiff's

disability ended as of November 1, 2010. (Tr. 11-18.)

## VI. Discussion

To be eligible for disability insurance benefits under the Social Security Act, plaintiff must prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Once a claimant becomes entitled to disability benefits, the Commissioner must periodically review the claimant's continued entitlement to such benefits. 20 C.F.R. § 404.1594(a). If there has been a medical improvement in a claimant's impairments and such improvement relates to the claimant's ability to work, the disability will be found to have ended if the claimant is able to engage in substantial gainful activity. 20 C.F.R. § 404.1594(a), (b)(3). The claimant has a

"continuing burden" to demonstrate that she is disabled.  *Nelson v. Sullivan*, 946

F,2d 1314, 1315 (8th Cir. 1991) (per curiam) (*citing Mathews v. Eldridge*, 424

U.S. 319, 336 (1976)).  "[N]o inference is to be drawn from the fact that the

individual has previously been granted benefits."  *Id.* (*citing* 42 U.S.C. § 423(f)).

"Whether a claimant's condition has improved is primarily a question for the trier

of fact, generally determined by assessing witnesses' credibility."  *Muncy v. Apfel*,

247 F.3d 728, 734 (8th Cir. 2001) (*citing Nelson*, 946 F.2d at 1316).

If the Commissioner seeks to end disability benefits due to an improvement

in the claimant's medical condition, she must demonstrate that "the conditions

which previously rendered the claimant disabled have ameliorated, and the

improvement in the physical condition is related to claimant's ability to work."

*Nelson*, 946 F.2d at 1315 (*citing* 20 C.F.R. § 404.1594(b)(2)-(5)).  "Medical

improvement" is any decrease in the medical severity of the claimant's

impairments which were present at the time of the most recent favorable medical

decision that the claimant was disabled.  20 C.F.R. § 404.1594(b)(1).  In

determining medical improvement, the severity of the claimant's current condition

is compared with the severity of her condition as of the date upon which the

claimant was last determined to be disabled.  20 C.F.R. § 404.1594(b)(7).  Once it

has been established that there has been a medical improvement, the Commissioner

must determine whether the claimant has the RFC to perform her past work.  20

C.F.R. § 404.1594(f)(7).  If she is able to do so, the claimant's disability will be found to have ended.  *Id.*  If the claimant cannot engage in her past relevant work, the Commissioner must consider whether the claimant can perform other jobs with her current RFC.  20 C.F.R. § 404.1594(f)(8).  If not, the claimant's disability will be found to continue.  *Id.*

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).

The Court must also consider any evidence which fairly detracts from the

Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188

F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent

conclusions may be drawn from the evidence, the Commissioner's findings may

still be supported by substantial evidence on the record as a whole. *Pearsall*, 274

F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f

there is substantial evidence on the record as a whole, we must affirm the

administrative decision, even if the record could also have supported an opposite

decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal

quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*,

315 F.3d 974, 977 (8th Cir. 2003).

A.    Medical Opinion Evidence

Plaintiff contends that the ALJ's determination as to her current RFC is not

supported by substantial evidence on the record as a whole inasmuch as the ALJ

improperly weighed the medical opinion evidence of record.  Specifically, plaintiff

argues that the ALJ erred by according no weight to the opinion of her treating

psychologist, Dr. Bosse; by according more weight to the opinion of Dr. Arain;

and by appearing to accord some weight to the state agency psychologist, Dr.

Singer.

In evaluating opinion evidence, the Regulations require the ALJ to explain

in the decision the weight given to any opinions from treating sources, non-treating

sources, and non-examining sources.  *See* 20 C.F.R. § 404.1527(f)(2)(ii).[12]  The

Regulations require that more weight be given to the opinions of treating

physicians than other sources.  20 C.F.R. § 404.1527(d)(2).  A treating physician's

assessment of the nature and severity of a claimant's impairments should be given

controlling weight if the opinion is well supported by medically acceptable clinical

---

[12]  Citations to 20 C.F.R. § 404.1527 are to the 2011 version of the Regulations, which were in effect at the time the ALJ rendered the final decision in this cause.  This Regulation's most

and laboratory diagnostic techniques and is not inconsistent with other substantial

evidence in the record.  *Id.; see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th

Cir. 2004).  This is so because a treating physician has the best opportunity to

observe and evaluate a claimant's condition,

> since these sources are likely to be the medical profess-
> ionals most able to provide a detailed, longitudinal pic-
> ture of [a claimant's] medical impairment(s) and may
> bring a unique perspective to the medical evidence that
> cannot be obtained from the objective medical findings
> alone or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

However, a medical source's opinion that an applicant is "unable to work"

involves an issue reserved for the Commissioner and is not the type of opinion

which the Commissioner must credit.  *Ellis v. Barnhart*, 392 F.3d 988, 994-95 (8th

Cir. 2005).

When a treating physician's opinion is not given controlling weight, the

Commissioner must look to various factors in determining what weight to accord

the opinion.  20 C.F.R. § 404.1527(d)(2).  Such factors include the length of the

treatment relationship and the frequency of examination, the nature and extent of

---

recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this
discussion but does not otherwise change the substance therein.

the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. *Id.* The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." *Id.*

In his written decision here, the ALJ determined to accord little weight to the opinion expressed in Dr. Bosse's May 2011 Mental RFC Questionnaire, noting the opinion to be inconsistent on its face as well as inconsistent with plaintiff's actual activities and other substantial evidence on the record as a whole. Because these reasons are supported by substantial evidence on the record as a whole, the ALJ did not err is discounting this Questionnaire.

The ALJ first noted Dr. Bosse's Questionnaire to be inconsistent on its face, finding Dr. Bosse's assigned GAF scores of 60/65 – indicating mild to moderate symptoms – to be inconsistent with his simultaneous findings that plaintiff experienced functional restrictions seriously limiting or precluding her ability to perform work-related activities involved in unskilled work. *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) (ALJ not compelled to give controlling weight to physician's opinion where GAF score of 58 was inconsistent with opinion that claimant suffered from extreme limitations). Internal inconsistencies in a

physician's opinion constitute good reason to accord less deference to the opinion. *Wagner v. Astrue*, 499 F.3d 842, 849-50 (8th Cir. 2007) (and cases cited therein).

In addition, the undersigned notes Dr. Bosse's Questionnaire to be inconsistent with his own treatment records.  "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."  *Davidson v. Astrue,* 578 F.3d 838, 842 (8th Cir. 2009); *see also Hacker v. Barnhart,* 459 F.3d 934, 937 (8th Cir. 2006).  Here, Dr. Bosse's treatment notes show plaintiff to have experienced intermittent symptoms of anxiety and depression, ranging between feeling okay at times and feeling down at other times.  The treatment notes show plaintiff's symptoms to be episodic in nature, triggered by stress over the disability review process or not having medication.  Notably, no observations are made by Dr. Bosse in any of his treatment notes showing plaintiff to experience the significant and debilitating limitations as set out in his May 2011 Questionnaire.  Where the limitations set out in a treating physician's assessment "stand alone" and were "never mentioned in [the physician's] numerous records or treatment" nor supported by "any objective testing or reasoning," the ALJ's decision to discount the treating physician's statement is not error.  *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).  Because none of Dr. Bosse's records note any such limitations, the ALJ did not err in according less than controlling weight to Dr. Bosse's May 2011 opinion.  *Charles*

*v. Barnhart*, 375 F.3d 777, 784 (8th Cir. 2004).

To the extent the ALJ determined to discount Dr. Bosse's opinion given its inconsistency with evidence of plaintiff's activities, this reason is likewise supported by substantial evidence.  As noted by the ALJ, and indeed as recorded in Dr. Bosse's treatment records, plaintiff wrote and published a number of books, travelled to book signings where she engaged with the public and sold nearly all of her books, and made contact with familiar and unfamiliar people – even contemplating attending a class reunion because of these connections.  *See Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005) (substantial evidence supported ALJ's decision to discount physician's opinion given that claimant's actual behavior was clearly at odds with limitations described by the medical source); *Pearsall*, 274 F.3d at 1218 (medical record did not support alleged limitations caused by mental impairment where claimant's activities were not indicative of intense fear of crowds or people).

The ALJ also determined to accord little weight to Dr. Bosse's opinion given its inconsistency with other substantial evidence on the record.  In making this determination, the ALJ accorded more weight to Dr. Arain's and Dr. Singer's opinions, finding them to be consistent with each other as well as with the results of Dr. Jones's psychological evaluation.  For the following reasons, this was not error.

The ALJ thoroughly summarized the results of Dr. Jones's psychological evaluation and specifically noted Dr. Jones's summary of plaintiff's subjective report of her activities, including publishing books, attending book signings, attending church, frequent driving, paying bills, going out to eat, and engaging in fun activities.  The ALJ also noted Dr. Jones's own objective findings that plaintiff had good concentration, persistence, and pace throughout the examination and exhibited only mild symptoms.  As noted by the ALJ, the opinion expressed by Dr. Arain in his February 2011 Mental MSS was consistent with Dr. Jones's observations.  In his MSS, Dr. Arain opined that plaintiff experienced no more than moderate limitations in her ability to perform work-related activities, including maintaining attention and concentration, performing activities within a schedule, performing at a consistent pace, responding to changes in the work setting, and getting along with coworkers and peers.  To the extent Dr. Arain assigned a GAF score of 50 in January 2011, the undersigned notes that Dr. Arain did not include this score in his February 2011 medical opinion as to plaintiff's ability to perform work-related activities.  Regardless, an ALJ is not required to adopt the entirety of a physician's opinion.  Instead, the ALJ's determination must be based upon a review of the record as a whole.  *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).  That is precisely what the ALJ did here.  Nevertheless, in light of the other substantial evidence of record as discussed *supra*, Dr. Arain's

GAF score assigned in January 2011 does not reflect plaintiff's actual abilities. *Hudson ex rel. Jones v. Barnhart,* 345 F.3d 661, 666-67 (8th Cir. 2003).

In addition, the ALJ noted Dr. Singer's RFC Assessment to likewise be consistent with Dr. Jones's report and Dr. Arain's MSS and therefore accorded more weight to the opinion rendered therein.  This was not error.  While opinions of non-treating practitioners who have attempted to evaluate a claimant without examination do not normally constitute substantial evidence on the record as a whole, *Coleman,* 498 F.3d at 772, the ALJ did not rely on Dr. Singer's opinion alone in determining plaintiff's disability to have improved.  Instead, the ALJ considered the treatment notes of Dr. Nowotny of Behavioral Health, which showed plaintiff to primarily be doing well and to experience situational stress in December 2010 associated with the disability review process.  The ALJ also considered the results of Dr. Jones's psychological evaluation and Dr. Arain's MSS, both of which showed less than disabling symptoms.  Because Dr. Singer's Assessment was consistent with this substantial medical evidence, the ALJ did not err in considering the Assessment in determining plaintiff's RFC.  *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007) (not error for an ALJ to consider opinion of state agency consultant rendered upon review of the medical evidence which was consistent with medical evidence of record).

Accordingly, inasmuch as the opinion expressed in Dr. Bosse's May 2011

RFC Questionnaire was inconsistent with other substantial evidence on the record as a whole, the ALJ did not err in according less weight to such opinion.  Indeed, inconsistency with other substantial evidence alone is a sufficient basis upon which to discount a treating physician's opinion.  *Goff*, 421 F.3d at 790-91.

A review of the ALJ's decision shows the ALJ to have evaluated all of the opinion evidence of record and to have provided good reasons for the weight accorded to each opinion.  Where, as here, there are conflicts in the medical opinion evidence, it is the duty of the Commissioner to resolve such conflicts. *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012); *Spradling v. Chater*, 126 F.3d 1072, 1075 (8th Cir. 1997); *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995).  For the reasons set out above, substantial evidence on the record as whole supports the ALJ's determination as to the weight he accorded the opinion evidence in this cause.

B.    ALJ's Consideration of Plaintiff's Activities

Plaintiff contends that the ALJ placed undue significance on the fact that she wrote and published three to five books, arguing that such activity does not correlate to a finding that plaintiff can perform her past relevant work as a house cleaner.   Contrary to plaintiff's assertion, however, the ALJ did not rely on this activity alone in finding plaintiff to have the RFC to perform her past work.

Plaintiff correctly notes that the ALJ found that she did not engage in

substantial gainful activity from the date of the previous favorable medical

decision through the date of medical improvement, that is, from September 8,

2004, to November 1, 2010.  As such, the ALJ did not find plaintiff's book writing

and publishing activities to rise to the level of substantial gainful activity such that

plaintiff would be rendered non-disabled on that basis alone.  Instead, a review of

the ALJ's decision shows him to have considered this activity, as well as other

activities, as a factor in determining what weight to accord the opinion evidence in

this cause as well as in determining plaintiff's credibility.  Specifically, the ALJ

noted plaintiff's various reported activities to include writing and self-publishing

three to five books in 2008 and 2010, attending book signing events, going to

church, going out to eat, engaging in fun activities, visiting friends' homes, and

shopping.  The ALJ also noted plaintiff to be the primary caregiver to her two

young children, which included taking her children to and from the bus stop on

school days.  The ALJ did not err in considering these activities in determining

what weight to accord the medical opinion evidence in this cause.  (*See* discussion

*supra* at Sec. VI.A.)  Nor did the ALJ err in considering such activities in

determining plaintiff's credibility.  *See, e.g., Buckner v. Astrue*, 646 F.3d 549, 558

(8th Cir. 2011) (caring for son, leaving residence nearly every day, riding in car,

shopping, socializing with friends, and attending religious services are activities

inconsistent with subjective complaints of disabling impairments, including mental

impairment); *Brown v. Astrue*, 611 F.3d 941, 955-56 (8th Cir. 2010) (getting child off to school, visiting mother, going to church, shopping for groceries, driving, paying bills, and working out regularly are activities inconsistent with subjective complaints of disabling mental impairment).[13]

A review of the ALJ's decision shows him to have considered the entirety of the record in this cause to determine that plaintiff sustained such medical improvement that she could perform her past relevant work as of November 1, 2010. While the ALJ considered plaintiff's authorship and publication of a number of books – as well as plaintiff's other activities – in determining what weight to accord the evidence in this cause, he did not unduly rely on such activity alone to find plaintiff able to perform her past relevant work. Plaintiff's contention otherwise must fail.

C.   Vocational Expert Testimony

In his hypothetical question posed to the vocational expert, the ALJ asked the expert to assume an individual limited to understanding, remembering, and

---

[13] Although plaintiff does not challenge the ALJ's credibility determination here, a review of the ALJ's decision nevertheless shows that, in a manner consistent with and as required by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted), the ALJ thoroughly considered the subjective allegations of plaintiff's disabling symptoms on the basis of the entire record before him and set out numerous inconsistencies detracting from the credibility of such allegations. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir.

carrying out simple instructions and non-detailed tasks.  In response, the expert

testified that such a person could perform plaintiff's past work as a house cleaner,

as set out in the *DOT* at number 301.687-014.  (Tr. 36-37.)  According to the *DOT*,

such work requires Level 2 reasoning, which involves the ability to "[a]pply

commonsense understanding to carry out detailed but uninvolved written or oral

instructions" and to "[d]eal with problems involving a few concrete variables in or

from standardized situations."  *See DOT* (4th ed., revised 1991), #301.687-014,

day worker, 1991 WL 672654.  Plaintiff claims that the expert's testimony that she

can perform such work conflicts with the *DOT* inasmuch as her RFC limits her to

performing only "simple" tasks, and thus that the ALJ erred in relying on such

testimony to find plaintiff's disability to have ended.

In *Moore v. Astrue*, 623 F.3d 599 (8th Cir. 2010), the Eighth Circuit

addressed a similar argument that plaintiff raises here:  that a finding that a

claimant can perform work requiring Level 2 reasoning as described by the *DOT* is

inconsistent with an RFC that limits her to performing only simple tasks.  Noting

that the *DOT* describes Level 1 reasoning as the ability to "[a]pply commonsense

understanding to carry out simple one- or two-step instructions," the Eighth Circuit

observed that the hypothetical question posed to the expert in *Moore* "did not limit

'simple' job instructions to 'simple *one or two-step* instructions' or otherwise

_____

1992).

indicate that Moore could perform only occupations at a *DOT* Level 1 reasoning

level." *Moore*, 623 F.3d at 604 (emphasis in original).

> Indeed, the Level 2 reasoning definition refers to
> "detailed but *uninvolved* " instructions.  The dictionary
> defines "uninvolved" as "not involved," and in turn
> defines "involved" as "complicated, intricate."  There is
> no direct conflict between "carrying out simple job
> instructions" for "simple, routine and repetitive work
> activity," as in the hypothetical, and the vocational
> expert's identification of occupations involving
> instructions that, while potentially detailed, are not
> complicated or intricate.

*Id.* (internal citations omitted) (emphasis in *Moore*).

As in *Moore*, the ALJ here likewise did not limit plaintiff's reasoning abilities to a

level commensurate with Level 1 reasoning as defined in the *DOT*.  Although the

ALJ limited plaintiff to performing simple tasks, he did not restrict her to

performing tasks that involve only one- or two-step instructions.  Accordingly,

there was no conflict between the hypothetical question posed by the ALJ and the

vocational expert's response.  *Id.*

Nevertheless, plaintiff's exclusive reliance on the *DOT* as a definitive

authority on job requirements is misplaced.  *Hall v. Chater*, 109 F.3d 1255, 1259

(8th Cir. 1997).  It is well established that definitions in the *DOT* "are simply

generic job descriptions that offer the approximate maximum requirements for

each position, rather than their range." *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000) (internal quotation marks and citation omitted); *see also Jones v. Astrue*, 619 F.3d 963, 978 (8th Cir. 2010); *Hillier v. Social Security Admin.,* 486 F.3d 359, 366–67 (8th Cir. 2007); *Hall*, 109 F.3d at 1259.  "[N]ot all of the jobs in every category have requirements identical to or as rigorous as those listed in the *DOT*." *Wheeler*, 224 F.3d at 897.  Indeed, the *DOT* itself "cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities."  *Id.*

Here, there is nothing in the record to suggest that the vocational expert ignored the reasoning limitation contained in the ALJ's hypothetical when she determined that the job of house cleaner was a suitable job that a person with such a limitation could perform.  *See Moore*, 623 F.3d at 604; *Whitehouse v. Sullivan,* 949 F.2d 1005, 1006 (8th Cir.1991) ( "[T]he ALJ could properly assume that the expert framed his answers based on the factors the ALJ told him to take into account.").  Because there was no conflict between the vocational expert's testimony and the *DOT,* the ALJ properly relied on the expert's testimony.  *See Moore*, 623 F.3d at 604.

## VII.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the Commissioner's decision that plaintiff obtained medical improvement such that

she was able to perform her past relevant work as of November 1, 2010, is

supported by substantial evidence on the record as a whole, and plaintiff's claims

of error should be denied.  Inasmuch as substantial evidence on the record as a

whole supports the Commissioner's decision, this Court may not reverse the

decision merely because substantial evidence exists in the record that would have

supported a contrary outcome or because another court could have decided the case

differently.  *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001); *Browning v.

Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992).  Accordingly, the Commissioner's

determination that plaintiff obtained medical improvement such that she was able

to perform her past relevant work as of November 1, 2010, is affirmed.

Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is

entered this same date.


_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

- 39 -

Dated this 15th  day of January 2014.